# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Verizon Pennsylvania LLC and Verizon North LLC, | : | |
| | : | |
| Petitioners | : | **CASES CONSOLIDATED** |
| | : | |
| v. | : | No. 521 C.D. 2021 |
| | : | |
| Pennsylvania Public Utility Commission, | : | |
| | : | |
| Respondent | : | |

| | | |
|---|---|---|
| Metropolitan Edison Company, Pennsylvania Electric Company and Pennsylvania Power Company, | : | |
| | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 530 C.D. 2021 |
| | : | Argued: May 18, 2022 |
| Pennsylvania Public Utility Commission, | : | |
| | : | |
| Respondent | : | |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE ELLEN CEISLER, Judge
                  HONORABLE LORI A. DUMAS, Judge
                  HONORABLE STACY WALLACE, Judge

OPINION BY JUDGE WOJCIK                  FILED: September 21, 2023

In these consolidated matters, Verizon Pennsylvania, LLC, and Verizon North, LLC (collectively, Verizon), and Metropolitan Edison Company (Met-Ed), Pennsylvania Electric Company (Penelec), and Pennsylvania Power Company (Penn Power) (collectively, FirstEnergy) petition for review of the order of the Pennsylvania Public Utility Commission (PUC) entered on April 15, 2021, denying Verizon's petition for partial reconsideration of the PUC's December 18, 2020 Opinion and Order. In the December 18, 2020 Opinion and Order, the PUC determined that FirstEnergy had charged Verizon unlawfully high rates dating back to July 2011, and ordered FirstEnergy to reduce rates going forward and issue refunds to Verizon effective November 20, 2019.

FirstEnergy seeks reversal of the PUC's determination in its entirety, asserting violations of Pennsylvania and federal law, and constitutional rights. FirstEnergy raises numerous points of error and abuses of discretion relating to the PUC's findings of unjust and unreasonable rates, calculations, and the award of retroactive relief. Verizon challenges the PUC's determination on the basis that it erred or abused its discretion by curtailing the retroactive date for the issuance of refunds for unlawful overcollections to November 20, 2019, instead of allowing refunds retroactive to July 12, 2011, or, at the very least, November 2015, which is consistent with the applicable statute of limitations period. Upon review, we affirm.

## I. Background

This matter involves a dispute between Verizon and FirstEnergy over utility pole attachment[1] rates. By way of background, pole attachment rates are the

---

[1] The term "pole attachment" refers to "any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility." 47 U.S.C. §224(a)(4).

rates that utilities or pole owners charge each other or third parties to attach their equipment to their utility poles per joint user agreements (JUAs) or pole license attachment agreements. Utility poles are essential infrastructure "upon which all broadband deployment relies." *Assumption of Commission Jurisdiction over Pole Attachments from the Federal Communications Commission* (PUC, Docket No. L-2018-3002672, filed August 29, 2019) (*2019 Assumption Order*), slip op. at 1. The sharing of utility pole space to distribute various services – electricity, telephone, cable television, internet, etc. – promotes efficiency,[2] but it is not devoid of problems. Congress recognized that "utilities by virtue of their size and exclusive control over access to pole lines, are unquestionably in a position to extract monopoly rents . . . in the form of unreasonably high pole attachment rates." *In the Matter of Implementation of Section 224 of the Act – A National Broadband Plan for Our Future*, 26 FCC Rcd. 5240, 5242 (2011) (*2011 Pole Attachment Order*) (internal quotation and citation removed).

To curb against "monopoly rents" and anti-competitive tendencies that would stymie the growth of the communications market, in 1978, the United States (U.S.) Congress enacted Section 224 of the Communications Act of 1934,[3] commonly known as the Pole Attachment Act (PAA), which Pennsylvania adopted in 2020, pursuant to 52 Pa. Code §77.4. *See Southern Company Services, Inc. v. Federal Communications Commission*, 313 F.3d 574, 576 (3d Cir. 2002). Section 224(f)(1) of the PAA contains a "nondiscriminatory access" provision requiring any utility that uses its poles, ducts, conduits, or rights-of-way for wire communications

---

[2] The alternative – construction of separate poles for separate services – would be costly and disruptive to communities.

[3] 47 U.S.C. §224. The Communications Act of 1934, 47 U.S.C. §§151-646, was substantially amended by the Telecommunications Act of 1996, 47 U.S.C. §§251-276.

to provide cable television or telecommunications companies with access to that space on a nondiscriminatory basis. 47 U.S.C. §224(f)(1). In addition, Section 224(b)(1) of the PAA requires utilities to charge "just and reasonable" pole attachment rates. 47 U.S.C. §224(b)(1). If a utility does not comply with the just and reasonable rate requirement, a telecommunications attacher may seek a lawful rate and a refund of its overpayments by filing a pole attachment complaint with the appropriate agency. *See id.*

In 2011, in the interest of promoting infrastructure deployment, the Federal Communications Commission (FCC) comprehensively revised its pole attachment rules so that similarly situated telecommunications providers would pay similar pole attachment rates for comparable access. *See 2011 Pole Attachment Order*, 26 FCC Rcd. at 5244. Of particular import, the FCC created a "New Telecom Rate" by adopting a definition of cost that yields a new "just and reasonable" telecommunications rate and reduces the apportionment of the common pole costs included in the "Old Telecom Rate" formula.[4] *Id.* at 5299. The New Telecom Rate was based on incremental costs rather than fully allocated costs. *Id.* The purpose of the new policy was "to improve the efficiency and reduce the potentially excessive costs of deploying telecommunications, cable, and broadband networks, in order to accelerate broadband buildout" and "promote competition and increase the availability of robust, affordable telecommunications and advanced services to consumers throughout the nation." *Id.* at 5241. The policy was targeted towards helping competitive local exchange carriers (CLECs) and cable operators, not

---

[4] The Old Telecom Rate included costs that bore no relation to the cost of providing space for an attachment and were not necessitated by Section 224(e) of the PAA, 47 U.S.C. §224(e). In other words, none of the costs under the Old Telecom Rate had any relation to the provision of space on a pole for pole attachments because the utility would incur such costs regardless of the presence of the pole attachments. *2011 Pole Attachment Order*, 26 FCC Rcd. at 5299.

incumbent local exchange carriers (ILECs).[5] *See id*. at 5335. The FCC noted that ILECs generally have access to utility pole space via negotiated, long standing JUAs, not pole license agreements. *Id.* at 5335. Recognizing that the JUAs were entered into between parties with relatively equivalent bargaining power, the FCC expressed reluctance to find rates, terms, and conditions in those JUAs unjust or unreasonable. *Id.* The *2011 Pole Attachment Order* took effect on July 12, 2011.

However, in 2018, following complaints by ILECs that utility pole owners were charging them pole attachment rates significantly higher than the rates charged to their competition, the FCC revised its policy to level the playing field. *See In the Matter of Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd. 7705, 7707 (2018) (*2018 Third Report and Order*). The FCC observed that the ILECs' "bargaining power vis-à-vis utilities has eroded since 2011" because of the decline in ILEC pole ownership. *Id.* at 7768. The FCC revised its "rules to establish a *presumption* that, for newly-negotiated and *newly-renewed* pole attachment agreements between [ILECs] and utilities, an [ILEC] *will receive comparable pole attachment rates, terms, and conditions as a similarly-situated telecommunications carrier or a cable television system (telecommunications attachers)*." *Id.* at 7767 (emphasis added). The FCC found that ILECs "are similarly situated" to "telecommunications attachers" and thus are entitled to "comparable" rates that are no higher than the New Telecom Rate. *Id.* at 7769. "The utility can *rebut the presumption with clear and convincing*

---

[5] ILECs are large telephone exchange service companies that previously held a regional monopoly before the Telecommunications Act of 1996 was enacted on February 8, 1996. *See* 47 U.S.C. §251(h). ILECs "frequently have access to pole attachments pursuant to [JUAs]" or pole ownership. *2011 Pole Attachment Order*, 26 FCC Rcd. at 5335, 5338. CLECs are smaller telecommunications carriers competing with the already established ILECs without similar pole access. *See id.* at 5354; *see also* 47 U.S.C. §153.

*evidence* that the [ILEC] receives net benefits under its pole attachment agreement with the utility that *materially advantage* the [ILEC] over other telecommunications attachers." *Id.* at 7768 (emphasis added). In cases where a utility rebuts the presumption, the FCC designated the Old Telecom Rate as "the maximum rate that the utility and [ILEC] may negotiate." *Id.* at 7771.

Against this backdrop of rate reform, on November 20, 2019, Verizon, an ILEC, filed a pole attachment complaint (Complaint) against FirstEnergy, an electric utility,[6] with the FCC. *See* Reproduced Record (R.R.) at 19a-66a. In the Complaint, Verizon claimed that the negotiated rates FirstEnergy charged Verizon per their JUAs were "unjust and unreasonable" in light of Section 224 of the PAA, 47 U.S.C. §224, and the FCC's implementing regulations and orders, *i.e.*, the *2011 Pole Attachment Order* and the *2018 Third Report and Order*. R.R. at 20a. Verizon asserted that the pole attachment rates should be comparable to New Telecom Rates that FirstEnergy charges to CLECs and cable companies under pole attachment license agreements. *Id.* at 20a. Verizon claimed it was entitled to a refund, reflecting the difference between the rates it paid and the New Telecom Rates it should have paid since July 12, 2011, the effective date of the *2011 Pole Attachment Order*, plus interest. *Id*. at 20a, 64a. FirstEnergy filed an Answer denying all material allegations in the Complaint and raising affirmative defenses, which Verizon answered.

During the pendency of the proceedings before the FCC, the PUC assumed jurisdiction over pole attachment rate disputes. *See 2019 Assumption*

---

[6] The parties stipulated that FirstEnergy companies are "utilities" under Section 224(a)(1) of the PAA, 47 U.S.C. §224(a)(1), because each is an electric utility that owns or controls poles used, in whole or in part, for wire communications. *See* Reproduced Record (R.R.) at 1456a (Joint Statement).

6

*Order*, slip op. at 1. Consequently, on March 23, 2020, the FCC transferred Verizon's Complaint to the PUC. The PUC referred the matter to an administrative law judge (ALJ) for adjudication.

Before the ALJ, the parties submitted a Joint Statement, which included the following stipulated facts. R.R. at 1455a-60a. Verizon and FirstEnergy are parties to 10 substantially similar JUAs that contain the rates, terms, and conditions for each party's use of the other party's utility poles. *Id.* at 1456a. The JUAs were entered into with Verizon's predecessor companies between 1958 and 1988 and were amended between 1999 and 2009 to include the currently operative pole attachment rate provisions. *Id.* Five of the JUAs are with Met-Ed, four are with Penelec, and one is with Penn Power. *Id*. at 1456a; *see id.* at 239a-560a. The JUAs are still in effect. *Id.*

The 2018 rental year is the most recent year that all three subsidiaries of FirstEnergy invoiced and collected annual pole attachment rental fees or an "annual Deficiency Rate rental fee" from Verizon. R.R. at 1456a. The 2018 invoices cover 412,697 poles jointly used by the parties, with FirstEnergy owning 301,854 (73%) and Verizon owning 110,843 (27%).[7] *Id*. Met-Ed sends Verizon five annual invoices based on four Memoranda of Understanding entered in 2009. *Id.* at 1457a; *see id*. at 370a-91a. Penelec sends Verizon five annual invoices based on four Memoranda of Understanding entered in 2009. *Id.* at 1457a; *see id.* at 525a-40a. Penn Power and Verizon send each other one annual invoice based on an

---

[7] The 2018 invoices associated with Met-Ed's service area cover 159,448 poles jointly used by the parties, with Met-Ed owning 129,421 (81%) and Verizon owning 30,027 (19%), and with the annual Deficiency Rate rental fee being applied only to so-called "deficiency poles." The 2018 invoices associated with Penelec's service area cover 220,259 poles jointly used by the parties, with Penelec owning 146,859 (67%) and Verizon owning 73,400 (33%). The 2018 invoices associated with Penn Power's service area cover 32,990 poles jointly used by the parties, with Penn Power owning 25,574 (78%) and Verizon owning 7,416 (22%). R.R. at 1456a-57a.

amendment to the JUA entered in 1999. R.R. at 1457a; *see id.* at 558a-59a. Under the Penelec and Penn Power JUAs, each party pays a per-pole rate for use of the other party's poles. In contrast, under the Met-Ed JUA, Met-Ed charges Verizon an "annual Deficiency Rate rental fee" for so-called "deficiency poles," which is the difference between the number of joint use poles Verizon owns (19%) and the higher number of joint use poles Verizon would own if Verizon owned 45% of the joint use poles. For comparative purposes, the annual Deficiency Rate rental fee Met-Ed charges can be converted into "reciprocal" per-pole rental rates that can be calculated based on the assumption that both parties charge the same per-pole rental rate for use of the other party's poles. The parties agreed to monthly and annual rates FirstEnergy companies had charged between 2011 and 2019. R.R. at 1457a. All other facts remained in dispute. *See id.*

In lieu of in-person hearings as a result of the disruption caused by the COVID-19 pandemic, the parties offered a Joint Motion to Admit Stipulated Items into the record followed by briefs in support of their legal arguments. *See* R.R. at 9a.

Based on the stipulated facts, evidence, and arguments presented, the ALJ determined that Verizon satisfied its burden of proving it was entitled to a rebuttable presumption to attachment rates set by the New Telecom Rate. Critically, the ALJ determined that FirstEnergy failed to rebut this presumption by showing that Verizon receives a material advantage per the terms of the JUAs. Because FirstEnergy charged Verizon a rate other than the New Telecom Rate to attach to FirstEnergy's utility poles, the ALJ found that, as of July 12, 2011, FirstEnergy failed to charge Verizon a just, reasonable, and competitively neutral rate for Verizon's use of space on FirstEnergy's poles as required by law. By recommended

8

decision dated September 15, 2020, the ALJ recommended that Verizon's Complaint be granted in part and denied in part. As a remedy for FirstEnergy's unlawful practice, the ALJ recommended that FirstEnergy reduce rates going forward using the New Telecom Rate and refund amounts it collected in violation of the law as of March 11, 2019, the effective date of the rates established under the New Telecom Rate methodology. *See* ALJ Recommended Decision, 1-76; R.R. at 2996a-3073a.

Both parties filed exceptions to the ALJ's recommended decision with the PUC. Verizon requested the PUC to reconsider the effective date for the refunds. Verizon asserted it was entitled to a refund as of July 12, 2011 – the effective date of the *2011 Pole Attachment Order* or, in the alternative, November 20, 2015, which is four years preceding the date it filed its Complaint and consistent with the applicable statute of limitations period under Section 1312(a) of the Public Utility Code, 66 Pa. C.S. §1312(a). FirstEnergy challenged the recommended decision in its entirety. FirstEnergy asserted that the ALJ failed to apply the correct legal standards and ignored FCC precedent and erred and abused his discretion by determining that the rates charged under the JUAs were not just and reasonable, by inserting the New Telecom Rate into the parties' JUAs, and by granting a refund.

By decision dated December 18, 2020, the PUC granted in part and denied in part the parties' exceptions and adopted the ALJ's recommended decision, as modified. *See* PUC Opinion and Order, 12/18/20 (PUC Op.), at 1-80; *see* R.R. at 3339a-442a. The PUC agreed with the ALJ that FirstEnergy charged unlawfully high rates, and as a remedy, must reduce its rates to the lawful level and refund the excess amounts it collected from Verizon. The PUC adopted the ALJ's "well-reasoned discussion" of the applicable legal standard under the PUC's new pole attachment regulations, including his rejection of FirstEnergy's alternate rate-setting

9

approach. PUC Op. at 41-42. The PUC found, "[b]ased on the record evidence in this case," that "the New Telecom Rate is the just and reasonable competitively neutral rate" as required by the PUC's regulations. *Id.* at 38-42. The evidence showed that Verizon's use of FirstEnergy's poles under the JUAs is in many ways comparable to, and in other ways disadvantageous relative to, its competitors' use of the same poles. The PUC determined that Verizon should pay the same New Telecom Rate that its competitors are guaranteed. The PUC also agreed with the ALJ that the New Telecom Rate must be calculated using the default inputs in the regulations because FirstEnergy's request for alternate inputs was based on "a limited, flawed, and skewed data set." *Id.* at 51. The PUC found that the ALJ "properly rejected" FirstEnergy's arguments about the remedy for its unlawful conduct, explaining that the pole attachment regulations and the Public Utility Code[, 66 Pa. C.S. §§101-3316,] give the PUC authority to set lawful rates and "award refunds of amounts previously collected in violation of law." *Id.* at 65. The PUC modified the ALJ's recommended decision by adopting November 20, 2019, as the effective date of the refund.[8] *Id.* at 80-81. The PUC noted that "the FCC has indicated that pole attachments are a major impediment to deploying advanced networks that can provide broadband service" and "hope[d] that providers [that] benefit considerably from any pole attachment rate reductions commit a portion of those savings to making broadband available and affordable in Pennsylvania." *Id.* at 66 n.41.

---

[8] The PUC also modified the ALJ's recommended decision by removing the dictum statement, which was contrary to the conclusion reached, that the PUC "is giving Verizon the benefits of a first-class airline seat at coach prices." PUC Op. at 19 n.10, 22; R.R. at 3401a-02a. Notwithstanding the modification to omit, FirstEnergy continues to reference the ALJ's quote throughout its brief. *See* FirstEnergy Principal Brief at 5, 7, 54-55.

Verizon sought partial reconsideration, which the PUC denied on the merits by reconsideration order dated April 15, 2021 (Reconsideration Order). Reconsideration Order at 1; R.R. at 3483a.[9] Thereafter, Verizon and FirstEnergy each timely petitioned for review with this Court. By order dated June 3, 2021, this Court consolidated the cases for review and, after briefing, heard argument.[10] In addition to the parties' briefs, we are also presented with an amicus curiae brief filed by Energy Association of Pennsylvania.[11]

---

[9] On January 14, 2021, within the 30-day appeal period for filing a petition for review, the PUC granted reconsideration for jurisdictional purposes. In so doing, the PUC retained jurisdiction to rescind, amend, or affirm its December 18, 2020 Opinion and Order, and the appeal period did not commence until the entry of a new order after reconsideration of the merits of the original order. Pa.R.A.P. 1701(b)(3); *United States Steel Corp. v. Public Utility Commission*, 850 A.2d 783, 788 n.8 (Pa. Cmwlth. 2004). Thus, the merits of the PUC's December 18, 2020 Opinion and Order are properly before this Court.

[10] Our review

> is limited to determining whether substantial evidence supports the necessary findings of fact, whether the [PUC] erred as a matter of law, and whether constitutional rights were violated. We defer to the [PUC's] interpretation of the Public Utility Code and its own regulations unless the [PUC's] interpretations are clearly erroneous. We may not substitute our judgment for that of the [PUC] when substantial evidence supports the [PUC's] decision on a matter within the [PUC's] expertise. Judicial deference is even more necessary when the statutory scheme is technically complex. On issues of law, our standard of review is *de novo* and our scope of review is plenary.

*Sunoco Pipeline, L.P. v. Public Utility Commission*, 295 A.3d 37, 50 n.10 (Pa. Cmwlth. 2023) (citations and quotations omitted).

[11] Energy Association of Pennsylvania is a trade association representing electric and natural gas utilities operating in Pennsylvania.

11

## II. Issues

FirstEnergy presents 10 issues for review on the basis that the PUC erred and abused its discretion and made findings unsupported by substantial evidence. First, FirstEnergy contends that the PUC incorrectly determined that the existing rates FirstEnergy charged Verizon per the JUAs were unjust and unreasonable under the Public Utility Code without any consideration of cost of service. Second, the PUC erred and abused its discretion by adopting and applying the FCC's regulations in a manner inconsistent with Pennsylvania law and FCC precedent. Third, the PUC incorrectly determined that Verizon is entitled to the New Telecom Rate. Fourth, the PUC incorrectly calculated the New Telecom Rate. Fifth, the PUC failed to consider the impact of its decision on FirstEnergy's electric customers and how its decision effectively subjects them to a secret rate increase. Sixth, the PUC abused its discretion when it based its decision on its "hope" that Verizon would use a "portion" of the rate savings to expand broadband in Pennsylvania. Seventh, the PUC erred in determining that the New Telecom Rate should be inserted into the existing JUAs. Eighth, the PUC erred and abused its discretion by granting retroactive rate relief under the modified JUAs and awarding Verizon refunds. Ninth, the PUC failed to state "the exact amount to be paid" by FirstEnergy and failed to "make findings upon pertinent questions of fact," as required by Section 1312(a) of the Public Utility Code, 66 Pa. C.S. §1312(a). Lastly, FirstEnergy contends that the PUC improperly refused to grant its request to create a regulatory asset and to defer any refunds and reduced rates awarded to Verizon for future rate recovery.

Verizon challenges the PUC's determination based solely on the selection of November 20, 2019, as the effective date for the refund. Verizon asserts

that it is entitled to a refund of its overpayment of rates effective July 12, 2011 – the date the FCC required electric utility pole owners to provide just and reasonable rates that are competitively neutral. Alternatively, and at a minimum, Verizon claims it is entitled to a refund as of November 2015 as the applicable statute of limitations under the Public Utility Code allows a party to seek refunds four years prior to the date of filing a complaint.

### III. Discussion
### A. FirstEnergy
### 1. Unjust and Unreasonable Rates/Cost of Service

FirstEnergy argues that the PUC erred in determining that its existing pole attachment rates in the JUAs with Verizon were unjust and unreasonable without taking into consideration cost of service. Cost of service is the polestar of ratemaking. The JUAs were negotiated based on fully allocated costs. The PUC's determination is contrary to Pennsylvania law and precedent, namely, *Lloyd v. Public Utility Commission*, 904 A.2d 1010 (Pa. Cmwlth. 2006), which held that other ratemaking principles or considerations do not trump cost of service.

Section 1301 of the Public Utility Code provides:

> Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, *shall be just and reasonabl*e, and in conformity with regulations or orders of the [PUC]. Only public utility service being furnished or rendered by a municipal corporation, or by the operating agencies of any municipal corporation, beyond its corporate limits, shall be subject to regulation and control by the [PUC] as to rates, with the same force, and in like manner, as if such service were rendered by a public utility.

66 Pa. C.S. §1301 (emphasis added). A "rate" is defined as a fare, toll, charge, rental, or other compensation of any public utility and all "rules, regulations,

13

practices, classifications or contracts affecting" it. Section 102 of the Public Utility Code, 66 Pa. C.S. §102.

The PUC adopted the FCC's regulations relating to pole attachments rates and complaints. 52 Pa. Code §77.4(a). According to the adopted regulations, a "rate is just and reasonable" provided it

> assures a utility the recovery of *not less than the additional costs of providing pole attachments*, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way. The [PUC] shall exclude from actual capital costs those reimbursements received by the utility from cable operators and telecommunications carriers for non-recurring costs.

52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1406(b)) (emphasis added). The regulation clearly incorporates cost-based inputs but is limited to "additional costs" of providing the pole attachments and does not reflect "fully allocated costs" in arriving at the New Telecom Rate. *See id.* FirstEnergy concedes this point. *See* FirstEnergy Principal Brief, at 31 ("the 'New Telecom Rate' . . . [is] based on incremental costs rather than fully allocated costs"). The regulation provides formulas for determining whether a pole owner is charging more than the statutory maximum just and reasonable rate based upon calculations using default inputs for pole height, space occupied, unusable space, and average number of attaching entities. 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1406(d)(2)). FirstEnergy's argument that the PUC was required to consider fully allocated costs in the New Telecom Rate ignores the regulatory language.

14

Further, FirstEnergy's reliance on *Lloyd* in support of its position that a fully-allocated-cost formulary is required is misplaced. First, *Lloyd* involved "retail distribution and transmission rates" and not pole attachment rates, which are different in key respects. Retail distribution and transmission rates are governed by the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa. C.S. §§2801-2815, still in effect pursuant to Section 1308(d) of the Public Utility Code, 66 Pa. C.S. § 1308(d). *Lloyd*, 904 A.2d at 1012. Electric utilities charge retail distribution and transmission rates to cover their fully allocated costs to provide electric "transmission and distribution services to retail electric customers." *Lloyd*, 904 A.2d at 1014 n.5. "Transmission and distribution costs" are defined by the Competition Act as "[*a*]*ll costs directly or indirectly incurred* to provide transmission and distribution services to retail electric customers." 66 Pa. C.S. §2803 (emphasis added). "This includes the return of and return on facilities and other capital investments necessary to provide transmission and distribution services and associated operating expenses, including applicable taxes." *Lloyd*, 904 A.2d at 1014 n.5. Such costs are known as "stranded costs." *Id.* at 1014.

In contrast, electric utilities are permitted to charge *additional costs* for pole attachment rates for use of *excess* space on the pole that the electric utility itself already utilizes. 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1406). Electric utilities are not authorized to charge rates covering *all* costs associated, only "additional costs" attendant thereto. *Id.* For this reason, different cost of service considerations apply. So, while cost of service considerations ensure that electric utilities are fully compensated for "all costs" incurred in providing distribution and transmission services, *see Lloyd*, 904 A.2d at 1109, the same cost considerations are

15

not applicable in the pole attachment context because the nature of the use and costs are different as is the applicable regulatory scheme.

Upon review, the PUC did not ignore precedent or arguments about cost of service and fully allocated costs. Rather, the PUC applied the incremental cost formula for pole attachment rates as set forth in the regulations and properly distinguished the precedent relied upon by FirstEnergy. Thus, we discern no error or abuse of discretion in this regard.

### 2. FCC Regulations and Precedent

Next, FirstEnergy argues that the PUC improperly applied the FCC's regulations in a manner inconsistent with FCC precedent. The PUC adopted the FCC regulations on a "turn-key" basis and stated that its decisions would be consistent with FCC decisions. *See 2019 Assumption Order*, slip op. at 4-5, 31. However, the PUC inexplicably failed to follow FCC precedent, which has repeatedly denied application of the New Telecom Rate to ILECs, such as Verizon, in pole attachment complaint cases involving JUAs.

The Public Utility Code authorizes the PUC to supervise and regulate all public utilities doing business within the Commonwealth by issuing regulations, not inconsistent with the law, as may be necessary or proper in the exercise of its powers or for the performance of its duties. Section 331 of the Public Utility Code, 66 Pa. C.S. §331. Pursuant to this authority, in 2018, the PUC began the rulemaking process to assert jurisdiction over pole attachment matters. During this process, FirstEnergy had the opportunity to assert its position that FCC precedent should be considered binding and controlling but did not do so. *See generally* PUC's Brief, Appendix B (FirstEnergy's Reply Comments).

16

In 2019, after notice, the PUC promulgated regulations adopting the FCC rules pertaining to pole attachment matters. 52 Pa. Code §77.4. Pursuant to Section 77.5(c) of the PUC's regulations, FCC orders promulgating or interpreting federal pole attachment rules constitute "persuasive authority" in interpreting the PAA, 47 U.S.C. §224. 52 Pa. Code §77.5(c); *see 2019 Assumption Order*, slip op. at 16, 34. In adopting this position, the PUC explained: "[O]ccasionally, reasons may exist to deviate from the FCC's interpretation. Thus, our language in Section 77.5(c) does not preclude the [PUC] from using its discretion to form separate interpretations to benefit the Commonwealth." *2019 Assumption Order*, slip op. at 35. The PUC continued: "FCC orders are persuasive, meaning that they do not establish binding precedent that the [PUC] would follow regardless of whether any particular application would be rational under a set of given circumstances." *Id.* The PUC explained that it envisioned "instances where an interpretation by the FCC, which is charged with developing a nationwide scheme, may not align with Pennsylvania interests." *Id.* at 34. Because FCC precedent is not considered binding or controlling on the PUC's adjudicatory process to address and resolve pole attachment matters, we conclude that the PUC did not, and could not, violate the law by choosing to deviate from FCC precedent.

### 3. Application of the New Telecom Rate

Next, FirstEnergy argues that the PUC used an unlawful evidentiary framework in reaching its determination that Verizon should receive the reduced New Telecom Rate. FirstEnergy asserts that it presented overwhelming evidence rebutting the regulatory presumption by showing that Verizon receives material competitive advantages under the JUAs as compared to the license agreements between FirstEnergy and CLECs. Where the presumption is rebutted, the FCC has

consistently held that no more than the Old Telecom Rate should apply. The PUC has erred or abused its discretion by deviating from FCC's persuasive precedent.

The PUC's pole attachment regulations are binding and have the force and effect of law. *See Brockway Glass Co. v. Public Utility Commission*, 437 A.2d 1067, 1070 (Pa. Cmwlth. 1981). Consequently, the PUC was required to follow the regulations in resolving Verizon's Complaint, which it did. Although the PUC advised that it would treat the FCC decisions interpreting those same rules *persuasively*, as discussed above, it is not bound by FCC precedent. 52 Pa. Code §77.5(c); *see 2019 Assumption Order*, slip op. at 16, 34.

Pursuant to the adopted regulation, the PUC was required to first determine if the challenged JUAs were entered into *or renewed* after the effective date of 47 C.F.R. §1.1413(b) – March 11, 2019. 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1413(b)). If after, there is a rebuttable presumption that the ILEC, i.e., Verizon, may be charged a rate no higher than the New Telecom Rate, *unless* the utility, i.e., FirstEnergy, demonstrates that the ILEC receives benefits under the rate that "materially advantages" the ILEC over other telecommunications carriers by clear and convincing evidence. *Id.* "The clear and convincing standard requires evidence that is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear [conclusion], without hesitancy, of the truth of the precise facts [in] issue."[12] *Commonwealth v. Maldonado*, 838 A.2d 710, 715 (Pa. 2003) (citation and quotations omitted).

_____

[12] Pennsylvania recognizes three standards of proof: (1) beyond a reasonable doubt; (2) clear and convincing evidence; and (3) preponderance of the evidence. *Commonwealth v. Maldonado*, 838 A.2d 710, 715 (Pa. 2003). "[T]he most stringent standard -- beyond a reasonable doubt -- is applicable in criminal trials due to the gravity of the private interests affected; these interests lead to a societal judgment that, given the severe loss that occurs when an individual is erroneously convicted of a crime, the public should bear virtually the entire risk of error." *Id.*
**(Footnote continued on next page…)**

Here, the PUC found that Verizon established that the JUAs were "entered into or renewed" after the March 11, 2019 effective date of 47 C.F.R. §1.1413(b) based on the automatic renewal provisions contained in the JUAs. PUC Op. at 24-25. This finding, which FirstEnergy does not challenge on appeal, triggered the rebuttable presumption that Verizon could not be charged a rate higher than the New Telecom Rate unless FirstEnergy successfully rebutted this presumption. However, the PUC determined that FirstEnergy failed to meet its burden to prove, *by clear and convincing evidence*,[13] that the terms of the JUAs provided Verizon with material competitive advantages. *Id*. at 38-42.

FirstEnergy claims that the PUC erred or abused its discretion by disregarding FirstEnergy's "overwhelming evidence" that it provides Verizon with numerous advantages. FirstEnergy Principal Brief, at 23, 41. Specifically, FirstEnergy alleges that Verizon receives the following advantages per the parties' JUAs:

> (1) providing Verizon with guaranteed access to the FirstEnergy Companies' poles; (2) granting Verizon the lowest position on the FirstEnergy Companies' poles; (3) enabling Verizon to construct its communications systems

---

"The preponderance-of-the-evidence standard, by contrast, reflects a belief that the two sides should share the risk equally; for this reason, it is applicable in a civil dispute over money damages, where the parties may share an intense interest in the outcome, but the public's interest in the result is 'minimal.'" *Id*. Stated otherwise, "[t]o establish a claim by a preponderance of the evidence means to offer evidence that outweighs or is more convincing than, by even the smallest amount, the probative value of the evidence presented by the opposing party." *Povacz v. Public Utility Commission*, 280 A.3d 975, 999 n.25 (Pa. 2022); *accord Se-Ling Hosiery, Inc. v. Margulies*, 70 A.2d 854, 856-57 (Pa. 1950). The clear-and-convincing standard falls squarely in between these two evidentiary standards. *Maldonado*, 838 A.2d at 715.

[13] The ALJ and the PUC found that FirstEnergy did not meet the less stringent preponderance-of-the-evidence standard. *See* PUC Op. at 25, 41; ALJ Recommended Decision, at 46.

19

unfettered by significant make-ready expense; (4) saving Verizon time and costs by overlashing[14] its existing facilities or lighting its existing dark fiber capacity to reach new customers and supply additional services to existing customers; (5) allowing Verizon to avoid upfront work costs and simply "notify and attach" to the Companies' poles; (6) enabling Verizon to avoid paying attachment application fees; (7) providing more lenient overlashing rules to Verizon than its competitors; (8) allowing Verizon to avoid field audit costs; and (9) enabling Verizon to benefit from the FirstEnergy Companies' comprehensive vegetation management program.

FirstEnergy's Principal Brief at 42 (citing R.R. at 2845a-49a);[15] *see* R.R. at 2590a. FirstEnergy argues, as it did before the PUC, that these contractual terms constitute material competitive advantages for Verizon. In support, FirstEnergy relies on three federal cases in which the FCC concluded that similar terms constituted material advantages. *See In the Matter of Bellsouth Telecommunications, LLC d/b/a AT&T Florida v. Duke Energy Florida, LLC,* 36 FCC Rcd. 18252 (2021) (*Duke Energy*); *In the Matter of Verizon Maryland LLC v. The Potomac Edison Company*, 35 FCC Rcd. 13607 (2020) (*Potomac Edison*); *In the Matter of BellSouth Telecommunications, LLC d/b/a AT&T Florida v. Florida Power and Light Company*, 35 FCC Rcd. 5321 (2020) (*FP&L*).

---

[14] "Overlashing" is "when a service provider physically ties its wiring to other wiring already secured on the pole." *2019 Assumption Order*, slip op. at 6.

[15] Notably, FirstEnergy does not direct where these terms may be located in the parties' JUAs or where evidentiary support may be found regarding the advantageous nature of these terms in either the certified record or reproduced record, which alone encompasses over 3,500 pages. *See* Pa.R.A.P. 2119(c) ("If reference is made to the . . . evidence. . . or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears."). FirstEnergy merely cited to its principal brief filed in the PUC proceeding, in which it made these same claims. *See* FirstEnergy's Principal Brief at 42 (citing R.R. at 2845a-49a). It is not the responsibility of this Court to scour the record to find evidence in support of an argument. *See Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007).

20

Contrary to FirstEnergy's assertions, the PUC fully considered each of the purported advantages. PUC Op. at 32. The PUC noted that both parties presented evidence demonstrating various advantages and disadvantages that Verizon realizes as a result of the JUAs. PUC Op. at 25; *see* ALJ Recommended Decision, at 44. The PUC considered all the evidence presented, including Verizon's evidence disputing the existence, and/or significance, of the purported advantages. PUC Op. at 34. Verizon vigorously argued that FirstEnergy failed to distinguish Verizon from its competitors or prove that a competitive advantage justified a substantially higher rate per pole. Verizon also claimed that FirstEnergy failed to account for any unique disadvantages that apply to Verizon under the JUAs as compared to the competition under pole license agreements. *Id.* at 34-35.

Based on the evidence presented, the PUC found that FirstEnergy does not provide Verizon "a net neutral advantage under the JUAs as compared to the terms and conditions it provides Verizon's competitors." PUC Op. at 38. The PUC agreed with the ALJ's conclusion that "the JUAs are comparable to FirstEnergy's license agreements with Verizon's competitors." *Id.* The PUC explained, "Verizon, like its competitors, must bear costs associated with placing, maintaining, rearranging, transferring, and removing its attachments; make a written application for space on FirstEnergy's poles; comply with FirstEnergy's construction specifications; and accommodate third parties attached to FirstEnergy's poles." *Id.* at 38-39. Notably, the PUC found that the advantages FirstEnergy claims are outweighed by the disadvantages. *Id*. at 25, 39. For example,

> the ALJ rejected FirstEnergy's argument that Verizon is materially advantaged because Verizon can overlash its existing facilities to reach new customers. The ALJ reasoned that any benefit received for overlashing is a result of Verizon placing its original facilities on the poles

21

in the first place. The ALJ explained that Verizon's actions in this regard should not prevent it from obtaining the New Telecom Rate; rather Verizon should be commended for utilizing its existing facilities to benefit existing customers by overlashing. Additionally, the ALJ found FirstEnergy's claim that Verizon can simply "notify and attach" to FirstEnergy's poles as being insufficient to rebut Verizon's presumption to receiving the New Telecom Rate. The ALJ also correctly reasoned that the field audit costs that Verizon forgoes in relation to its competitors, citing the per pole yearly cost, fails to overcome the presumption under Section 1.1413. Moreover, the ALJ discounted the purported material advantage related to FirstEnergy's vegetation management program. Explaining that vegetation management around poles and wires benefits all attachers, the ALJ logically explained that such a program cannot be considered as a material advantage to one particular attacher.

*Id.* at 39 (citing ALJ Recommended Decision, at 44-45). The PUC continued:

The [JUAs] disadvantage Verizon as compared to its competitors because, among other things, unlike its competitors, Verizon must "at its sole expense" determine the condition of more than 110,000 joint use poles that it owns and shares with FirstEnergy, keep them "in a safe and serviceable condition," and replace or repair its poles as they become defective.

PUC Op. at 40 (quoting ALJ Recommended Decision, Finding of Fact No. 17). Ultimately, the PUC concluded that FirstEnergy failed to rebut the regulatory presumption by showing that Verizon received a material competitive advantage under the JUAs as compared to the pole license agreements between FirstEnergy and competitive telecommunications carriers by clear and convincing evidence.

The PUC's findings are largely supported by Verizon's evidence, namely the testimony of Verizon's witness, Stephen C. Mills (Mills), and exhibits, including Exhibits SCM-1 (Mills' sworn affidavit adopting his testimony before

22

FCC as direct testimony in the PUC proceeding), and SCM-2 (the 10 JUAs between FirstEnergy and Verizon). *See* R.R. at 1465a-69a (Verizon's Statement No. 1.0 - Mills' Direct Testimony), 2420a-492a (Verizon's Statement No. 1.1 – Mills' Surrebuttal Testimony), 2650a-94a (Verizon's Statement No. 1.2 – Mills' Surrejoinder Testimony), 1470a-502a (Exhibit SCM-1), 1503a-824a (Exhibit SCM-2). Mills testified in direct response to the testimony offered by FirstEnergy's witness, Stephen Schafer (Schafer). Mills went through each of the purported advantages and provided detailed explanations as to how they did not materially advantage Verizon. For example, Mills testified that Verizon is not guaranteed any space on FirstEnergy's poles. *Id.* at 1498a. Even Schafer acknowledged that, "from the time the [JUAs] were executed until 1996, Verizon was historically reserved space on the pole," but that is no longer the case. *Id.* at 2580a. Mills also testified that Verizon was not advantaged by the lowest position on FirstEnergy's poles. *Id.* at 1500a. Mills explained that the lowest position is exposed to more harm from vehicles, vandalism, contractors who work in the space, and similar hazards. *Id.* Verizon receives more requests than its competitors to raise its cables to accommodate oversize loads. *Id.* Mills testified that Verizon does not incur fewer make-ready costs than its competitors and lacks a competitive advantage with respect to application fees because FirstEnergy does not charge application fees to Verizon or other attachers. *Id.* at 1493a. Mills testified that Verizon's competitors are subject to the same make-ready timelines and overlashing rules. *Id.* at 1494a. Mills testified that FirstEnergy, Verizon, and all of Verizon's competitors equally benefit from FirstEnergy's vegetation management. *Id.* at 2448a. Even Schafer conceded as much. *Id.* at 2592a. Schafer generally struggled "to quantify the benefits Verizon receives under the [JUAs] to demonstrate that Verizon is not

23

entitled to a New Telecom Rate." *Id.* Schafer also testified that it was his belief "that it [was] not necessary for FirstEnergy to quantify the benefits Verizon receives under the [JUAs] to demonstrate Verizon is not entitled to the [N]ew [T]elecom [R]ate." *Id.*

The PUC's findings regarding the advantages and disadvantages are supported by substantial evidence of record presented by Verizon, and the relative lack of evidence presented by FirstEnergy. Contrary to FirstEnergy's assertions, the PUC did not disregard FirstEnergy's evidence, but instead relied upon Verizon's conflicting evidence. Simply because FirstEnergy presented evidence did not obligate the PUC to credit the evidence or assign it any special weight. *Milkie v. Public Utility Commission*, 768 A.2d 1217, 1221 (Pa. Cmwlth. 2001). Determinations as to the weight and credibility of the evidence are within the sole province of the PUC as factfinder, and we will not disturb them on appeal. *Id.*

Although the cases cited by FirstEnergy found that some of the same terms were materially advantageous based upon the evidence presented, the key difference here is that those same benefits did not amount to a net material advantage when the disadvantages were factored into the analysis. *See Duke Energy*; *Potomac Edison*; *FP&L.* Furthermore, as discussed above, federal precedent serves merely as a guide, not binding precedent. 52 Pa. Code §77.5(c); *see 2019 Assumption Order*, slip op. at 16, 34.

Upon review, the PUC did not err or abuse its discretion in finding that FirstEnergy did not meet its burden of rebutting the regulatory presumption. FirstEnergy did not show that the purported benefits Verizon receives under the JUAs materially advantaged it over other attachers. Because FirstEnergy failed to

24

rebut the presumption, we conclude that the PUC did not err or abuse its discretion in determining that Verizon was entitled to receive the New Telecom Rate.

### 4. Calculation of New Telecom Rate

Next, FirstEnergy argues that the PUC incorrectly calculated the New Telecom Rate. Under the New Telecom Rate formula, the spatial presumptions may be rebutted by either party. *See* 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1410). The PUC incorrectly rejected FirstEnergy's evidence rebutting the presumptive inputs for calculating the New Telecom Rate simply because the evidence was prepared for litigation. *See* PUC Op. at 50-51. FirstEnergy contends that preparation for litigation is not a valid or rational basis for rejecting evidence. Nothing justifies the PUC taking a different approach in this proceeding.

The rate formula to calculate the New Telecom Rate is expressed as:

$$Space\ Factor = \frac{Space\ Occupied\ + \frac{2}{3} \frac{Unusable\ Space}{Average\ Number\ of\ Attachers}}{Pole\ Height}$$

52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1406(d)(2)(i)). The regulations provide presumptive inputs for the calculation. *See id.* (incorporating 47 C.F.R. §§1.1409, 1.140). Specifically, "the space occupied by an attachment is presumed to be one foot. The amount of usable space is presumed to be 13.5 feet. The amount of unusable space is presumed to be 24 feet. The pole height is presumed to be 37.5 feet." *Id.* (incorporating 47 C.F.R. §1.1410).

"These presumptions may be rebutted by either party." 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1410). Inputs that vary from the regulatory presumptions must be supported by reliable evidence. *In the Matter of Bellsouth*

25

*Telecommunications, LLC d/b/a AT&T North Carolina & d/b/a AT&T South Carolina v. Duke Energy Progress, LLC*, 36 FCC Rcd. 13684, 13704 n.140 (2021). As the FCC has explained, "[t]hese formulas are treated as rebuttable presumptions: they are normally to be used unless a utility chooses to present probative direct evidence regarding an acceptable alternative to meet its unique circumstances." *In the Matter of Amendment of Rules & Policies Governing the Attachment of Cable Television Hardware to Utility Poles*, 2 FCC Rcd. 4387, 4394 n.27 (1987) (*Cable Television Hardware*).

As previously explained, the PUC found that "Verizon has demonstrated that it is entitled to the [N]ew [T]elecom [R]ate . . . because the JUAs were renewed after March 11, 2019[,] and . . . FirstEnergy failed to rebut this presumption by showing that the [JUAs] provide Verizon material advantages." PUC Op. at 50. As a result, Verizon was entitled to the New Telecom Rate based on certain factual presumptions, subject to rebuttal by either party. 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1410).

Although FirstEnergy offered evidence in rebuttal regarding the inputs used in the rate calculation,[16] the PUC rejected it. The PUC noted that "the data used to calculate the New Telecom Rates should not be data quickly gathered during a review of a small set of poles in response to litigation." PUC Op. at 50-51; *see* ALJ Recommended Decision, at 55. That the evidence was prepared for litigation informed the PUC's decision but was not the primary reason for its rejection. Rather, the PUC found that "FirstEnergy did not provide 'probative direct evidence' sufficient to forgo the rate calculation inputs in the FCC regulations." PUC Op. at 51 (quoting *Cable Television Hardware*, 2 FCC Rcd. at 4394 n.27). The PUC found

---

[16] We note that FirstEnergy does not highlight or cite to what evidence it offered to rebut the presumptions. *See* FirstEnergy Principal Brief, at 47-49.

26

that FirstEnergy's evidence was "based on outdated rates of return" and was "limited, flawed, and skewed." *Id.* Thus, the PUC concluded that FirstEnergy's evidence was "insufficient to rebut the . . . presumptions." *Id.* As factfinder, the PUC is empowered to review record evidence, make credibility determinations, and accord evidentiary weight. *Milkie*, 768 A.2d at 1221. Upon review, we discern no error or abuse of discretion in the PUC's determination that FirstEnergy did not provide reliable, "probative direct evidence" sufficient to rebut the regulatory presumptions. Thus, the PUC properly determined that the New Telecom Rate must be calculated using the regulatory presumptions, not the inputs offered by FirstEnergy.

### 5. Secret Rate Increase

Next, FirstEnergy argues that the consequence of the PUC's determination in this matter is a "secret rate increase" for FirstEnergy's electric customers. FirstEnergy customers will pay more in base electric rates in order to subsidize Verizon's refunds and reduced rates, yet they have no idea how much that rate increase will be. At the same time, FirstEnergy's electric customers are guaranteed nothing in return from Verizon. Although the PUC based its decision on a purported need to expand broadband, nothing in the PUC's opinion requires Verizon to use any portion of the refunds or reduced rates to expand broadband service in FirstEnergy service territories or in Pennsylvania generally. By failing to consider the interests of FirstEnergy's electric customers, FirstEnergy asserts that the PUC has abused its discretion.

We decline to speculate whether the PUC's application of the New Telecom Rate will trigger a rate increase for FirstEnergy's electric customers. As the PUC properly determined, the proper proceeding to review a general rate

27

increase is a base rate proceeding under 66 Pa. C.S. §1308(d), not a pole attachment complaint case between utilities. A base rate proceeding is the proper forum to consider the interests of FirstEnergy's electric customers. We, therefore, discern no abuse of discretion.

### 6. Broadband Expansion "Hope"

FirstEnergy further contends that the PUC improperly based its decision on policy considerations. The PUC "hope[s]" that Verizon and other "providers [that] benefit considerably from any pole attachment rate reductions [will] commit a portion of those savings to making broadband available and affordable in Pennsylvania." PUC Op. at 66 n.41. The PUC's findings regarding broadband service in Pennsylvania and the impact of pole attachment rates on that service are not supported by any evidence of record. Verizon never presented any evidence that broadband service in Pennsylvania is lacking or that it requested refunds or reduced rates to help expand or improve broadband service. The PUC's findings must be based on evidence, not unsubstantiated speculation or hopes. FirstEnergy maintains that the PUC's policy consideration is an invalid basis upon which to base a decision.

FirstEnergy's argument that the PUC's decision is based on the "hope" that Verizon will use a "portion of the rate savings to making broadband available and affordable in Pennsylvania" is without merit. Although the PUC noted its policy goal in its decision, that goal did not serve as the basis for its decision. Public demand for affordable broadband access is one of several reasons the PUC asserted jurisdiction over pole attachments in the first place. *See 2019 Assumption Order*, slip op. at 1. However, there is no basis upon which to conclude that the PUC relied on this policy as grounds for its determination that the pole attachment rates

28

FirstEnergy charged Verizon were unjust and unreasonable. Rather, as discussed above, the PUC's determination was based on the law and record evidence that FirstEnergy charged Verizon in excess of the lawful rate.

### 7. New Telecom Rate Inserted in JUAs

FirstEnergy asserts that the PUC erred by directing the parties to insert the New Telecom Rate into the existing JUAs and by failing to direct the removal of advantageous terms. The PUC failed to recognize that the JUAs' terms and conditions were voluntarily negotiated between the parties based on the fully allocated costs of pole ownership whereas the New Telecom Rate is an incremental cost rate that makes no attempt to fully allocate common costs. If the PUC's decisions are upheld, Verizon would receive: (1) all the benefits of its existing JUAs, which its CLEC and cable competitors do not receive under their pole license agreements; and (2) the New Telecom Rate, which is the same rate that Verizon's competitors pay FirstEnergy to attach to the poles. By way of analogy, FirstEnergy claims that Verizon is receiving the benefits of a first-class airline seat at coach rates.

The PUC has the statutory authority to modify the terms, including the rates, of the JUAs between FirstEnergy and Verizon upon determining that they are unjust or unreasonable. Section 508 of the Public Utility Code, 66 Pa. C.S. §508. Specifically, Section 508 of the Public Utility Code provides:

> The [PUC] shall have power and authority to vary, reform, or revise, upon a fair, reasonable, and equitable basis, any obligations, terms, or conditions of any contract heretofore or hereafter entered into between any public utility and any person, corporation, or municipal corporation, which embrace or concern a public right, benefit, privilege, duty, or franchise, or the grant thereof, or are otherwise affected or concerned with the public interest and the general well-being of this Commonwealth. Whenever the [PUC] shall determine, after reasonable notice and hearing, upon its

29

own motion or upon complaint, *that any such obligations, terms, or conditions are unjust, unreasonable, inequitable, or otherwise contrary or adverse to the public interest and the general well-being of this Commonwealth*, the [PUC] shall determine and prescribe, by findings and order, the just, reasonable, and equitable obligations, terms, and conditions of such contract. Such contract, as modified by the order of the [PUC], shall become effective 30 days after service of such order upon the parties to such contract.

66 Pa. C.S. §508 (emphasis added). In addition, the regulations provide:

(a) If the [PUC] determines that *the rate, term, or condition complained of is not just and reasonable, it may prescribe a just and reasonable rate, term, or condition* and may:

(1) Terminate the unjust and/or unreasonable rate, term, or condition; [and]

(2) Substitute in the pole attachment agreement the just and reasonable rate, term, or condition established by the [PUC]; . . . .

52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1407(a)) (emphasis added).

Here, having determined that the rates in the parties' JUAs were unjust and unreasonable, the PUC properly exercised its statutory and regulatory authority by amending the terms of the JUAs to reflect the New Telecom Rate. However, the PUC did not modify the other contractual terms because it did not find the other terms were unjust or unreasonable or adverse to the public interest. The PUC also found that these terms were not materially advantageous. Thus, the PUC did not err or abuse its discretion by leaving these terms intact.

30

## 8. Retroactive Refund

FirstEnergy further contends that the PUC erred and abused its discretion by awarding Verizon refunds. For refunds to be granted here, the PUC had to modify the existing JUAs because the current pole attachment rates paid by both parties are set forth therein. The refund violates Section 508 of the Public Utility Code, which establishes that the PUC's contract modifications apply prospectively only – "30 days after service of such order upon the parties to such contract." 66 Pa. C.S. §508. Furthermore, the PUC lacked the power under Section 1312(a) of the Public Utility Code, 66 Pa. C.S. §1312(a), to award a refund. The PUC's decision to grant refunds was based on the incorrect and unlawful finding that FirstEnergy's existing pole attachment rates are unjust and unreasonable. By awarding a refund based on a retroactive application of the New Telecom Rate, the PUC violated the U.S. and Pennsylvania Constitutions by impermissibly impairing contracts and taking property without just compensation.

As previously discussed, Section 1301 of the Public Utility Code provides that a utility must charge just and reasonable rates. 66 Pa. C.S. §1301. The General Assembly has granted the PUC the express authority to abrogate an agreement between a public utility and any other party whenever it finds that the "obligations, terms, or conditions are unjust, unreasonable, inequitable, or otherwise contrary or adverse to the public interest and the general well-being of this Commonwealth." 66 Pa. C.S. §508. The PUC is authorized to prescribe "a just and reasonable rate, term, or condition" as a remedy. 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1407(a)); *accord* 66 Pa. C.S. §508. "Such contract, as modified by the order of the [PUC], shall become effective 30 days *after* service of such order upon the parties to such contract." 66 Pa. C.S. §508.

Modifying the contractual terms and conditions on a prospective basis is not the PUC's only remedial tool. *See* 66 Pa. C.S. §1312(a); 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1407(a)(3)). The PUC is statutorily authorized to award refunds when it has found that a utility has charged unreasonable and unjust rates, which is the case here. 66 Pa. C.S. §1312(a). Section 1312(a) of the Public Utility Code provides, as a general rule:

> If, in any proceeding involving rates, the [PUC] shall determine that any rate received by a public utility was unjust or unreasonable, or was in violation of any regulation or order of the [PUC], or was in excess of the applicable rate contained in an existing and effective tariff of such public utility, the [PUC] shall have the power and authority to make an order requiring the public utility to refund the amount of any excess paid by any patron, in consequence of such unlawful collection, within four years prior to the date of the filing of the complaint, together with interest at the legal rate from the date of each such excessive payment. In making a determination under this section, the [PUC] need not find that the rate complained of was extortionate or oppressive. Any order of the [PUC] awarding a refund shall be made for and on behalf of all patrons subject to the same rate of the public utility. The [PUC] shall state in any refund order the exact amount to be paid, the reasonable time within which payment shall be made, and shall make findings upon pertinent questions of fact.

66 Pa. C.S. §1312(a). The PUC is authorized to order the utility to refund the amount of any excess paid where the rate received by the utility was unjust or unreasonable. *Id*. It may order a refund "within four years prior to the date of the filing of the complaint." *Id.*

In addition, the regulations provide that the PUC may "[o]rder a refund, or payment, if appropriate." 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1407(a)(3)). "The refund or payment will normally be the difference between the

32

amount paid under the unjust and/or unreasonable rate, term, or condition and the amount that would have been paid under the rate, term, or condition established by the [PUC], plus interest, consistent with the applicable statute of limitations." *Id*.

FirstEnergy's arguments are initially premised on its position that the PUC's decision to award refunds was based on a flawed finding that the existing rates in the JUAs are unjust and unreasonable, which we have rejected above. As for FirstEnergy's retroactive argument, Section 1926 of the Statutory Construction Act of 1972, entitled "Presumption against retroactive effect," provides that "[n]o statute shall be constructed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa. C.S. §1926. The rules of statutory construction apply to regulations as well as statutes. *Pennsylvania Department of Corrections/State Correctional Institution-Somerset v. Workers' Compensation Appeal Board (Kirchner)*, 805 A.2d 633, 635 (Pa. Cmwlth. 2002).

Section 1312(a) of the Public Utility Code authorizes the PUC to issue refunds for rates *already received* by a public utility, where those rates are "unjust or unreasonable," or "in violation of any regulation." 66 Pa. C.S. §1312(a). Section 1312(a) establishes a four-year statute of limitations that terminates a party's right to seek refunds beyond four years prior to the date of the filing of a complaint. *Id*. By authorizing the PUC to issue such refunds, the General Assembly has clearly expressed its intention to allow retroactive relief. To conclude otherwise would essentially nullify the PUC's authority to issue a refund between the amount *already paid* under the unjust or unreasonable rate and the newly established just and reasonable rate.

As for the applicable refund period, the remedies available under the *2011 Pole Attachment Order* and the *2018 Third Report and Order* are available

33

*after* the effective date of those orders. *See 2018 Third Report and Order*, 33 FCC Rcd. at 7773-74 (providing modified pole attachment rules shall apply prospectively); *2011 Pole Attachment Order*, 26 FCC Rcd. at 5334, n.647 ("We decline to apply our new interpretation of [S]ection 224 retroactively, and make clear that [ILECs] only can get refunds of amounts paid subsequent to the effective date of this Order."). Section 1312(a) permits refunds to address the unlawful collection to precede four years prior to the date the complaint was filed. 66 Pa. C.S. §1312(a).

Here, the PUC awarded a refund for the difference between the rates paid under the JUAs and the New Telecom Rate as of November 20, 2019 – the date Verizon filed its Complaint. The November 20, 2019 date is *after* the effective dates of the *2011 Pole Attachment Order* and *2018 Third Report and Order.* It is also after Pennsylvania assumed jurisdiction on September 3, 2019, s*ee 2019 Assumption Order*, slip op. at 1, and after 47 C.F.R. §1.1407 was amended (effective October 4, 2018). It is within the four-year statute of limitations. 66 Pa. C.S. §1312(a). Thus, the PUC did not err or abuse its discretion by issuing a refund for the period at issue here.

Contrary to FirstEnergy's assertions, the PUC's action of modifying the JUAs and awarding Verizon retrospective relief does not violate the Contracts Clauses or deprive FirstEnergy of property without just compensation. The Contracts Clause of the U.S. Constitution provides that no state shall pass any law impairing the obligation of contracts. U.S. Const. art. I, §10. Similarly, the Contracts Clause of the Pennsylvania Constitution provides: "No *ex post facto* law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed." Pa. Const. art. I, §17. "[T]he impairment of [the] [C]ontracts [C]lause is not violated by a judicial determination,

34

but only by an enactment by the legislature." *Burns v. Public School Employees' Retirement Board*, 853 A.2d 1146, 1146 (Pa. Cmwlth. 2004). Because FirstEnergy challenges the PUC's quasi-judicial determination, not the legislative enactments, FirstEnergy fails to state a cognizable contracts claim. *See id.*

Even if FirstEnergy challenged the legislative enactments, "[i]f the regulatory statute is otherwise within the powers of Congress . . . its application may not be defeated by private contractual provisions." *2018 Third Report and Order*, 33 FCC Rcd. at 7731 (quoting *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224 (1986)). The General Assembly has given the PUC the power to supervise and regulate all public utilities doing business in the Commonwealth. 66 Pa. C.S. §501(b). This includes the power to modify the JUAs to ensure just and reasonable rates and award refunds when it has been found that a utility has charged unreasonable and unjust rates. Any alleged contractual impairment would be justified by this legitimate state purpose. *See Golden Rule Insurance Co. v. Insurance Department*, 641 A.2d 1255, 1260 (Pa. Cmwlth. 1994) (holding that the state regulation of the insurance business, which is a business affected with a public concern, is constitutional and not a Contracts Clause violation).

The Takings Clause of the U.S. Constitution emanates from the last clause of the Fifth Amendment providing that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause of the Pennsylvania Constitution similarly provides that private property shall not "be taken or applied to public use, without authority of law and without just compensation being first made or secured." Pa. Const. art. I, § 10. "Both constitutional provisions are interpreted using the same standards and framework." *Pennsylvania Workers' Compensation Judges Professional Association v. Executive*

*Board of the Commonwealth*, 853 A.2d 1146, 496 (Pa. Cmwlth. 2012), *aff'd*, 66 A.3d 765 (Pa. 2013). A properly awarded refund based on "just and reasonable rates" does not amount to an unlawful taking without just compensation. *See BellSouth Telecommunications v. Florida Power and Light Co.*, 36 FCC Rcd. 253, 257 (¶ 13) (2021) (rejecting Takings Clause argument). FirstEnergy's argument that the application of a just and reasonable rate does not constitute just compensation is unavailing. Thus, we conclude that the PUC did not err or abuse its discretion by awarding Verizon refunds.

### 9. Exact Amount to Be Paid

FirstEnergy maintains that the PUC violated Section 1312(a) of the Public Utility Code, 66 Pa. C.S. §1312, by not stating the "exact amount to be paid" by FirstEnergy, "the reasonable time within which payment shall be made," and findings upon pertinent questions of fact. The PUC's opinion simply ordered that, within 90 days, "the [p]arties are to determine the refund amounts" owed to Verizon. PUC Op. at 81. In this regard, FirstEnergy contends that the PUC unlawfully delegated its responsibility. Further, to calculate the exact refund amount, the PUC was required to determine the pole attachment rates that FirstEnergy must pay Verizon. As discussed above, the PUC's award of a refund contravened well-established law and evidence.

Section 1312(a) of the Public Utility Code provides that the "[PUC] shall state in any refund order the *exact amount to be paid*, the reasonable time within which payment shall be made, and shall make findings upon pertinent questions of fact." 66 Pa. C.S. §1312(a). The Public Utility Code does not direct, and this Court has not held, that the "exact amount to be paid" must be stated in numerical terms, as opposed to formulaic terms. *See, e.g., Emporium Water Co. v. Public Utility*

36

*Commission*, 859 A.2d 20, 22 (Pa. Cmwlth. 2004) (affirming order requiring "refunds for the difference between the tariff rates authorized under the [PUC]'s . . . order and the tariff rates that were declared unlawful"). Formulaic refunds are just as precise if not more so.

Here, the PUC found that, under each of the JUAs, the parties are charged reciprocal rates per pole, which are netted during each invoice period based on the number of poles owned by each party. PUC Op. at 2. The PUC determined that the New Telecom Rates are now applicable under all 10 JUAs as of November 20, 2019. *Id*. at 2, 25-26, 67. Because the parties agreed to charge reciprocal rates, FirstEnergy is now entitled to this same rate. The PUC stated the amount of the refund in formulaic terms: the difference between the rate paid under the JUAs and the New Telecom Rate, for an exact period, plus interest. *Id.* at 67. The PUC directed that Verizon's refund should be "prorated." *Id*. Because the formula produces an exact amount to be paid, we conclude that the PUC did not violate Section 1312 of the Public Utility Code or improperly delegate its authority by directing the parties to perform the calculations themselves using this formula.

### 10. Regulatory Asset

Finally, FirstEnergy argues that the PUC erred by failing to grant FirstEnergy's request to create a regulatory asset and defer any refunds and reduced rates for future rate recovery. Any reduction in the pole attachment rates paid by Verizon would ultimately decrease the revenues collected by FirstEnergy. Because the change in these rates is the direct result of a PUC action, the PUC should have permitted FirstEnergy to defer, on an ongoing basis with carrying costs, any annual reductions in pole attachment revenues received and seek recovery of these lost revenues in future base rate proceedings. FirstEnergy contends that, if the pole

37

attachment fees are reduced at any time other than when new base rates are set, its electric customers would continue paying less than they otherwise would have to pay because the existing offset to the revenue requirement would be higher than the pole attachment revenues received, thus creating a revenue shortfall for FirstEnergy.

The PUC is not required to create a regulatory asset in the context of this proceeding. Contrary to FirstEnergy's assertions, the reductions to the pole attachment rates are not the "direct result of a PUC action," but rather, they are the direct result of FirstEnergy maintaining inflated rates for approximately a decade following regulatory change. Finally, the PUC specifically preserved FirstEnergy's right to seek base rate increases to offset its pole attachment reductions in its next base rate proceeding. *See, e.g.*, *Columbia Gas of Pennsylvania, Inc. v. Public Utility Commission*, 613 A.2d 74, 76 (Pa. Cmwlth. 1992), *aff'd*, 636 A.2d 627 (Pa. 1994) (affording utility opportunity to seek recovery of increased costs in a base rate proceeding). Thus, we conclude that the PUC did not err or abuse its discretion by denying FirstEnergy's request for the creation of a regulatory asset in the context of pole rate attachment proceeding.

### B. Verizon
### 1. Refund Period

Lastly, we turn to Verizon's single contention of error regarding the refund period. Verizon contends that the PUC erred as a matter of law when it selected November 20, 2019, as the effective date for refunds. According to Verizon, refunds must be awarded "consistent with the applicable statute of limitations." 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1407(a)(3)). Here, the applicable statute of limitations covers all periods as of July 12, 2011, the date that federal law required electric utilities, including FirstEnergy, "to charge competitively neutral [pole attachment] rates." *See* 47 U.S.C. §224. Alternatively,

and at a minimum, the applicable statute of limitations is four years preceding the complaint (November 2015) under the Public Utility Code, which is consistent with the traditional limitations period for contract and unjust and unreasonable rate claims under Pennsylvania law. *See* 66 Pa. C.S. §1312(a); *see also* Section 5525 of the Judicial Code, 42 Pa. C.S. §5525 (prescribing four-year statute of limitations for contract claims). Verizon contends that the PUC's choice of a November 2019 effective date is incorrect as a matter of law because it is untethered to any statute of limitations and is arbitrary and capricious.

The PUC has discretion to establish a refund period that is less than the full length applied by the applicable statute of limitations. *See* 66 Pa. C.S. §1312(a); 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1407(a)(3)). As discussed above, Section 1312(a) of the Public Utility Code empowers the PUC to issue refunds "within four years prior to the date of the filing of the complaint." 66 Pa. C.S. §1312(a). The PUC's adopted regulations provide that the PUC "may" order a refund or payment if appropriate "consistent with the applicable statute of limitations." 52 Pa. Code §77.4(a) (incorporating 47 C.F.R. §1.1407(a)(3)). Because the PUC is not required to award refunds, the decision to award a refund for any period within the statute of limitations is a matter of PUC discretion. Although the PUC could have chosen a different refund period under law, this, in and of itself, does not constitute an abuse of discretion. Verizon has not demonstrated that the PUC erred or abused its discretion by choosing the date Verizon filed its Complaint as the beginning date of the refund period.

39

## IV. Conclusion

For the foregoing reasons, we affirm the order of the PUC.

_____
MICHAEL H. WOJCIK, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Verizon Pennsylvania LLC                          :
and Verizon North LLC,                            :
                                                  :  **CASES CONSOLIDATED**
                    Petitioners                   :
                                                  :
        v.                                        :  No.  521 C.D. 2021
                                                  :
Pennsylvania Public Utility                       :
Commission,                                       :
                                                  :
                    Respondent                    :


Metropolitan Edison Company,                      :
Pennsylvania Electric Company and                 :
Pennsylvania Power Company,                       :
                                                  :
                    Petitioners                   :
                                                  :
        v.                                        :  No. 530 C.D. 2021
                                                  :
Pennsylvania Public Utility                       :
Commission,                                       :
                                                  :
                    Respondent                    :


# **O R D E R**


AND NOW, this 21st day of September, 2023, the order of the
Pennsylvania Public Utility Commission, entered April 15, 2021, is AFFIRMED.


_____

MICHAEL H. WOJCIK, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Verizon Pennsylvania LLC : 
and Verizon North LLC, : **CASES CONSOLIDATED**
                Petitioners : 
  : 
         v. : No. 521 C.D. 2021
  : Argued:  May 18, 2022
Pennsylvania Public Utility : 
Commission, : 
              Respondent : 

 

Metropolitan Edison Company, : 
Pennsylvania Electric Company and : 
Pennsylvania Power Company, : 
              Petitioners : 
  : 
         v. : No. 530 C.D. 2021
  : 
Pennsylvania Public Utility : 
Commission, : 
              Respondent : 
  : 

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE STACY WALLACE, Judge

**DISSENTING OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**        **FILED:  September 21, 2023**

      Because I would conclude the Pennsylvania Public Utility Commission's (Commission) Opinion and Order in this matter violates the Public Utility Code[1]

---

[1] 66 Pa.C.S. §§ 101-3316.

(Code) and settled principles of public utility law, I would reverse that decision. Therefore, I must, respectfully, dissent from the well-written majority opinion.

It is well settled that an agency's regulations cannot violate its enabling statute and that regulations that do so will "fall by the wayside." *Hommrich v. Pa. Pub. Util. Comm'n*, 231 A.3d 1027, 1034-41 (Pa. Cmwlth. 2020) (citation omitted), *aff'd*, 245 A.3d 637 (Pa. 2021). Here, the Commission has reverse preempted the Federal Communications Commission's (FCC) jurisdiction over pole attachments in Pennsylvania and voluntarily adopted, in full, the FCC's pole attachment regulations without regard to whether those regulations are consistent with the Code and Pennsylvania law on ratemaking. FirstEnergy companies,[2] and amicus curiae Energy Association of Pennsylvania (EAP), argue the regulations adopted by, and relied upon by the Commission in this matter, are contrary to the Code and Pennsylvania precedent. I agree.

Sections 332(a) and 1309 of the Code, 66 Pa.C.S. §§ 332(a), 1309, require that **complainants** prove that existing rates are unjust and unreasonable by showing that there has been a change in facts and circumstances since the rates were originally fixed that now renders those rates unjust and unreasonable. *Shenango Twp. Bd. of Supervisors v. Pa. Pub. Util. Comm'n*, 686 A.2d 910, 914 (Pa. Cmwlth. 1996); *Schellhammer v. Pa. Pub. Util. Comm'n*, 629 A.2d 189, 193-94 (Pa. Cmwlth. 1993). Section 1304 of the Code, 66 Pa.C.S. § 1304, similarly places the burden on one claiming rate discrimination to show that a public utility is charging higher rates to the complainant so as to subsidize other customers or customer groups. *Sharon Steel Corp. v. Pa. Pub. Util. Comm'n*, 468 A.2d 860, 865 (Pa. Cmwlth. 1983).

---

[2] Metropolitan Edison Company, Pennsylvania Electric Company, and Pennsylvania Power Company.

The regulations adopted by the Commission for pole attachments effectively reverse who bears these heavy burdens. Instead of having to show that the negotiated, existing rate, that had to be just and reasonable or risk a complaint under Section 701 of the Code, 66 Pa.C.S. § 701, is now unjust and unreasonable or that there is rate discrimination, a complainant in a pole attachment case need only show that it entered into or renewed a joint use agreement after March 11, 2019, the effective date of the FCC regulation at 47 C.F.R. § 1.1413(b). If it does, the complainant enjoys a presumption that the existing rate is unjust and unreasonable and the new rate should be applied. 47 C.F.R. § 1.1413(b); 52 Pa. Code § 77.4(a) (adopting the federal regulations in Pennsylvania). The burden then shifts to the public utility to justify its already existing rates by producing "clear and convincing evidence that the incumbent local exchange carrier [(ILEC)] receives benefits under its pole attachment agreement with a utility that materially advantages the [ILEC] over other telecommunications carriers or cable television systems providing telecommunications services on the same poles." *Id.* This regulatory scheme **reverses** that which is set forth in the Code by placing the burden of proof on the public utility to show that its existing rates are just and reasonable.[3] Accordingly, I would hold that this regulatory burden shift conflicts with the Commission's enabling statute and must "fall by the wayside." *Hommrich*, 231 A.3d at 1035.

I also question whether the pole attachment regulations adopted by the Commission, and the Commission's Opinion and Order in this matter, abandon the "polestar" of utility ratemaking in Pennsylvania – cost of service. *Lloyd v. Pa. Pub.*

---

[3] Section 315(a) of the Code places this burden of proof on public utilities when the Commission files an action on the reasonableness of a utility's proposed or existing rate or when the complaint involves a proposed increase in rates. 66 Pa.C.S. § 315(a). This is not one of those situations.

*Util. Comm'n*, 904 A.2d 1010, 1020 (Pa. Cmwlth. 2006). By focusing the analysis on whether there was a contract or renewed contract on or after the date the FCC's regulations became effective, which is something other than cost of service, in determining whether rates are just and reasonable, the adopted regulations, and the Commission's Opinion and Order, are inconsistent with Pennsylvania precedent.

Finally, I am deeply concerned that the Commission's holding here, based on its adoption of the FCC's pole attachment regulations, will result in increased costs on FirstEnergy's ratepayers to replace the reduction in rates Verizon[4] will receive. The Commission is required to consider the interests of FirstEnergy's ratepayers in its regulations of the pole attachment rates, and in fact, had to certify to the FCC that it would do so as part of its reverse preemption. 47 U.S.C. § 224(c)(2). My reading of the Opinion and Order does not reveal any real analysis by the Commission of the impact its finding that the existing rates FirstEnergy charged Verizon were not just and reasonable, and ordering a reduction in rates and refunds, would have on FirstEnergy's ratepayers. The recoupment of the rates lost due to the Commission's decision in this matter must fall somewhere and that somewhere is likely on FirstEnergy's electric ratepayers. This is even more concerning because it is unclear whether Verizon will pass on those savings to its customers or will use them to increase broadband access in Pennsylvania – although the Commission hoped the latter will be the case, (Opinion and Order at 66 n.41). If it is not, the benefit from the Commission's decision will not flow to any ratepayer or customer in Pennsylvania, but to Verizon's shareholders.

The outcome of the Commission's Opinion and Order, and this Court's affirmation thereof, creates troubling precedent that will likely result in a windfall

---

[4] Verizon Pennsylvania LLC, and Verizon North LLC.

for Verizon shareholders that will be paid for by FirstEnergy's ratepayers. While the policy of expanding broadband in Pennsylvania is laudable, the Commission's reliance on that policy, and the **hope** that Verizon will act in furtherance of that policy, is misplaced. Finally, and most critically, because the FCC's regulations that the Commission adopted and relied upon here to justify the sweeping relief ordered do not comport with the Code or with Pennsylvania precedent, I would reverse the Commission's Opinion and Order. For these reasons, I must dissent.

 

 

 

_____
**RENÉE COHN JUBELIRER,** President Judge

Judge McCullough joins in this opinion.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Verizon Pennsylvania LLC and<br>Verizon North LLC,<br>                  Petitioners<br><br>       v.<br><br>Pennsylvania Public Utility<br>Commission,<br>                  Respondent | :  **CASES CONSOLIDATED**<br>:<br>:<br>:<br>:<br>:  No. 521 C.D. 2021<br>:<br>:<br>:<br>: |

| | |
|---|---|
| Metropolitan Edison Company,<br>Pennsylvania Electric Company and<br>Pennsylvania Power Company,<br>                  Petitioners<br><br>       v.<br><br>Pennsylvania Public Utility<br>Commission,<br>                  Respondent | :<br>:<br>:<br>:<br>:<br>:  No. 530 C.D. 2021<br>:  Argued:  May 18, 2022<br>:<br>:<br>:<br>: |


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE ELLEN CEISLER, Judge
                  HONORABLE LORI A. DUMAS, Judge
                  HONORABLE STACY WALLACE, Judge


CONCURRING OPINION
BY JUDGE WALLACE                          FILED:  September 21, 2023

In this novel and challenging case, the Majority affirms the decision of the Pennsylvania Public Utility Commission (PUC), which found Metropolitan Edison Company, Pennsylvania Electric Company, and Pennsylvania Power Company (collectively, FirstEnergy) charged Verizon Pennsylvania LLC and Verizon North LLC (collectively, Verizon) unjust and unreasonable pole attachment rates. I agree with the Majority's decision in full but write separately to discuss FirstEnergy's fifth and sixth issues.

FirstEnergy argues the PUC's decision will result in a "secret rate increase" for its customers. Moreover, FirstEnergy argues the PUC based its decision on the mere "hope" that Verizon would use a part of its refund and rate savings to expand broadband access. The fluctuating cost of electricity is a significant concern in the Commonwealth. Expanding access to broadband is also a laudable goal, particularly in our rural areas. *See* Ctr. for Rural Pa., *Broadband Availability and Access in Rural Pennsylvania*, https://www.rural.pa.gov/publications/broadband (last visited Sept. 20, 2023).

Despite the importance of these issues from a legislative or policy perspective, we as judges must faithfully apply the controlling law. *See Swords v. Harleysville Ins. Cos.*, 883 A.2d 562, 570 n.7 (Pa. 2005) (citing *Glenn Johnston, Inc. v. Dep't of Revenue*, 726 A.2d 384, 388 (Pa. 1999)). Because the law directs that Verizon receive relief, we cannot reach a contrary determination out of concern for FirstEnergy's customers or suspicion that Verizon will simply pocket the additional funds rather than expanding broadband access. Indeed, the Court holds in this case that Verizon is entitled to a refund of money FirstEnergy was never entitled to receive in the first place. It would be a greater wrong, under the circumstances, to condition Verizon's refund on using the money in a manner we direct.

For these reasons, I concur.

_____
STACY WALLACE, Judge