**Robert H. MILKIE, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 20, 1999.

Decided Feb. 23, 2001.

Michael D. Shaffer, Philadelphia, for petitioner.

Andrew S. Tubbs, Harrisburg, for respondent.

David B. MacGregor, Philadelphia, for intervenor, PP&L.

Before COLINS, Judge,
LEADBETTER, Judge, and
McCLOSKEY, Senior Judge.

LEADBETTER, Judge.

Robert H. Milkie appeals from an order of the Public Utility Commission (PUC) that dismissed Milkie's complaint against Pennsylvania Power & Light (PP & L). At issue is the proper application of a doctrine known as the "Waldron rule," under which a complainant may establish a prima facie case of overbilling by showing that the disputed bill was abnormally high when compared to prior bills, although his usage pattern had not changed. *Waldron v. Philadelphia Elec. Co.*, 54 Pa. PUC 98, 1980 WL 140964 (1980).

Milkie filed a formal complaint with the PUC on September 26, 1996. He claimed that he had been overcharged for electric usage at his vacation home from 1986 until early in 1996, when his bills dropped precipitously. Following a telephonic hearing at which both sides presented evidence, an administrative law judge recommended that Milkie's bills for 1993, 1994 and 1995 be recalculated based upon average usage during 1996 and 1997.[1] PP & L filed exceptions. The Commission reversed, concluding that Milkie failed to meet his burden of proof. Milkie now appeals to this court.

Milkie, an architect, testified that he designed the Pocono Lake vacation home to be energy efficient. He, his wife and two teenaged children, (whose primary residence is in Staten Island, New York) use the home "maybe once a month, sometimes once in two months," and for about one week during the Christmas holiday. When the house was empty, he set the thermostat at 40–45 degrees Fahrenheit and shut the water pump off and lights off, except for two automatic outside lights. The family's usage of the property had been "pretty consistent" in the eleven years they owned it. After he compared his bills with those received by neighbors living year-round in the area, in 1988 or 1989 Milkie notified PP & L that he suspected overbilling. He complained again in around 1992 and in 1996. Each time PP & L checked the meter and found it to be accurate. In February of 1996, he threatened to complain to the PUC and thereafter his bills dropped "probably 200 percent." Milkie presented his calculations as to his average payments (based upon his checking account records) during 1993, 1994, 1995 [disputed period] and after February of 1996 [undisputed period].

PP & L presented the testimony of John Janofsky, an employee whose duties included the investigation of billing complaints. He presented PP & L's usage and billing records for the Milkie property from 1994–97. Although these figures showed a far less dramatic difference between the average billings during the

---

1. The administrative law judge found that any overbillings prior to 1993 were beyond the applicable statute of limitations, and this ruling is not in issue in this appeal.

disputed and undisputed periods, they nonetheless verified a reduction in metered usage during 1996 and 1997.[2] Janofsky also testified that, based upon the billings, the bulk of electric usage by the Milkie family was heat-related, and explained the various factors which can affect heat loss and fluctuations in power usage. He had inspected the house in March of 1996 and in December of 1997. The Milkies were not in residence and a neighbor let him in. He testified to his observations and measurements of the house itself and of the appliances on the premises which would draw electric power when in use. On the December visit, he measured the temperature inside the house at 50 degrees although the thermostats were set at 45 degrees. He also found the fireplace flue to be open. In November of 1997, he checked the Milkies' electric meter and found it to be 99.8% accurate. He also identified a document (admitted as P–3) sent by the Bureau of Consumer Services of the Commission dated March 13, 1996, which stated "CO HAS BEEN ONSITE TO CHK PROPERTY METER CHKED OUT OK FOUND NO LEAKS CO CAN'T ACCOUNT FOR HIGH KW VS LOW USAGE." [3]

Finally, in lieu of further testimony, Milkie stipulated "that the actual usage was less than the potential [energy use at the home]" and that "the heat loss related usage at this home, assuming the temperature inside the home is 50 degrees and the temperature outside the home is minus 10 would be 20,356 KWH for the heating season." [4]

 On appeal, Milkie claims that the administrative law judge properly found that he had established a prima facie case of overbilling and that PP & L had failed to come forward with "co-equal" evidence, thus that the Commission erred in dismissing his complaint. The heart of this dispute, at all levels, reflects confusion about the "Waldron rule" and the role it plays in the PUC's adjudication of an overbilling claim. While the rule is often explained by stating that the ratepayer must establish certain specific elements [5] in order to make

2. Milkie testified that his average bills in 1993 were $199.56; in 1994 were $223.00; in 1995 were $184.13; and after February of 1996 were $98.75; Janofsky testified that PP & L's records reflected average bills of $179.36 in 1994; $183.24 in 1995; $145.76 in 1996; and $137.64 for the period November 1996 through November 1997. PP & L's records did not go back to 1993.

3. Interestingly, PP & L did not introduce any independent evidence of meter checks before 1996. The only evidence regarding the meter inspections of 1988–89 and 1992 was Milkie's testimony that PP & L advised him the meter was checked and found to be working properly. Milkie has not, however, challenged the PUC's reliance on this evidence.

4. Based upon this stipulation, PP & L made the following argument:
Mr. Milkie stipulated that the potential energy usage at the home is higher than the actual usage. In fact, the potential usage at the home stipulated to by Mr. Milkie is higher than the actual usage in any year for which PP & L has records
As Mr. Milkie is not contesting his bills after February 1996, we can take his summer usage in 1996 as uncontested, non-heat related usage (i.e., all the electric appliances in the home other than the electric heat). PP & L Hearing Exhibit No. 1 shows an average monthly usage of 798.33 KWH for June, July and August of 1996. This multiplied by 12 gives 9580 KWH for non-heat related appliances over the year. When this is added to the 20,356 KWH stipulated to by Mr. Milkie for heating the home to 50, it gives a yearly total of 29,936 KWH for actual, nondisputed appliance usage plus potential heat usage, even assuming the home is only heated to 50. This potential is higher than the actual yearly KWH totals for each year for which PP & L has records. The actual yearly totals are derived by adding the figures for each year under the "KWHUSAGE" column in PP & L Hearing Exhibit No. 1. Those totals are: 27,876 KWH for 1994, 28,861 KWH for 1995, 21,370 KWH for 1996 and 19,432 KWH for 1997.

5. For instance our Supreme Court stated in Burleson, "a complainant may establish a prima facie case by showing that his power usage for the billing period in question was unchanged from earlier periods and his bill for the same period was higher than previous

out a prima facie case of overbilling by a utility company, we believe this view is too restrictive. Rather, the controlling principle is that even where the utility can present evidence that it has tested the customer's meter and found it to be accurate, the customer may, nonetheless, prove his case by circumstantial evidence which would support a finding that the metered usage exceeded the actual usage. Thus, as our Supreme Court has explained, the rule operates as a device by which the complainant is protected from dismissal because of his inability to marshal *direct* proof that his meter had malfunctioned. *Burleson v. Pennsylvania Pub. Util. Comm'n*, 501 Pa. 433, 435–36, 461 A.2d 1234, 1235 (1983). Any circumstantial evidence which meets this standard will establish a prima facie case.[6]

 Once it is determined that the complainant has made out his prima facie case, the burden of going forward shifts to the utility, but the ultimate burden of persuasion remains with the complainant. The Commission[7] must measure the weight and credibility of all the evidence, and simply because the ratepayer has presented a prima facie case does not obligate the Commission to credit this evidence or to give it any special weight. If the utility presents evidence found to be of co-equal (or greater) weight with that of the complainant, the complainant will not have met his burden of proof. At this stage, the Waldron doctrine provides "that the mere proof by the utility that its power measuring devices were accurate is no longer the *sole* determinant as to whether there is a basis to a complaint of overbilling." *Id.* at

436, 461 A.2d at 1236 [emphasis supplied]. Finally, where the Commission has dismissed the complaint because the customer has failed to sustain his burden of persuasion (generally a fact question), rather than because the customer failed to present a prima facie case as a matter of law, the Waldron rule is irrelevant on appeal. *Id.* at 436, 461 A.2d at 1236.

On appeal, Milkie seeks to have us review whether he presented a prima facie case under Waldron, while PP & L argues that Waldron is of no consequence at this point and the proper focus of our review is whether the Commission's decision is supported by substantial evidence. That the parties view the issue before us in such a vastly different manner is explained by the fact that the Commission has employed language in its decision which is at variance with the nature of its analysis. Although opining that Milkie failed to establish a prima facie case, it is clear that the Commission reached its decision by reviewing and evaluating the weight and probative value of all the evidence. Therefore, we agree with PP & L as to our proper standard of review.

 Here, the Commission simply found Milkie's evidence to be of little weight. As it noted, where the premises in question is not a continuously occupied primary residence, but instead a vacation home used occasionally, the evidence concerning frequency and consistency of use during the disputed and undisputed periods must be reasonably specific to have significant probative value. However, Milkie's testimony concerning the consistency of the family's use of the property

---

bills." *Burleson v. Pennsylvania Pub. Util. Comm'n*, 501 Pa. 433, 435–36, 461 A.2d 1234, 1235 (1983).

6. It should be noted that whether or not that circumstantial evidence establishes a prima facie case is an inquiry into its legal sufficiency, not into the ultimate weight it will be accorded.

7. The Commission, not the ALJ, is the ultimate fact-finder in formal complaint proceed-

ings; it weighs the evidence and resolves conflicts in the testimony. Section 335(a) of the Public Utility Code, 66 Pa.C.S. § 335(a); *Pennsylvania Elec. Co. v. Pennsylvania Pub. Util. Comm'n*, 81 Pa.Cmwlth. 285, 473 A.2d 704 (1984). When reviewing the initial decision of an ALJ, the Commission has all the powers that it would have had in making the initial decision except as to any limits that it may impose by notice or by rule. 66 Pa.C.S. § 335(a).

was vague and somewhat equivocal.[8] It would appear self-evident that significant changes in power usage could result from the difference between monthly and bi-monthly visits, not to mention whether the home was visited more frequently during the heating season. Moreover, such occurrences as failing to close a fireplace flue between monthly or bi-monthly visits during the winter months could have a substantial impact. The Commission found that Milkie's general and conclusory testimony concerning consistency of use was outweighed by the evidence that the meters had been checked and found to be accurate and that the potential energy use in the home was greater than the use billed in the disputed period.[9] Such determinations are the sole province of the Commission as fact-finder, and we will not disturb them on appeal.

### ORDER

AND NOW, this 23rd day of February, 2001, the order of Pennsylvania Public Utility Commission in the above captioned matter is hereby AFFIRMED.

Judge COLINS dissents.

---

8. Milkie testified that:

It's been pretty consistent across the 11 years that I built it. We get up with the family, hopefully once a month, if we can, but with the school and kids and everything, we'll be lucky if we get there once a month.

We try and spend at least one week between Christmas and New Years there every year and basically that's it.

\* \* \*

Q. Did you use the property more [after February of 1996]?

A. No. Less, actually. Actually, it was about the same. I was using it about once a month.

N.T. 12/22/97 at 15, 22.

9. The Commission also noted that in all prior cases in which a charge of overbilling was

sustained on the basis claimed here, the complainant had shown a long pattern of constant usage followed by a sudden *increase* in his bills, while Milkie complains that the usage pattern established over many years in the past must be incorrect because his current bills are lower. As the PUC notes in its brief, a complaint about the level of billings in the past precludes the utility from conducting an investigation into the validity of the claim because it cannot go back in time to do a field survey of energy use in the home or check the meter for the relevant period. While we find the relative duration and order of the disputed and undisputed periods to be of no talismanic effect, they are factors which the Commission may consider.